BEADLE v. McCRABB et al. (No. 7319.)

(Court of Civil Appeals of Texas. Galveston. Nov. 9, 1917. On Motion for Rehearing, Dec. 10, 1917.)

1. APPEAL AND ERROR ⬲917(2)—REVIEW—PRESUMPTIONS—WAIVER OF DEMURRER.

Where there was nothing in the record to show that appellant's general demurrer or special exceptions were presented to the trial court for ruling, or that any order was entered with reference thereto, it will be presumed that they were waived.

2. WILLS ⬲166(1) — CONTESTS — UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

In a proceeding for the probate of a will which was opposed on the ground of undue influence, evidence held sufficient to sustain a verdict that the execution of the will was induced by proponent's undue influence.

3. WILLS ⬲159—VALIDITY—UNDUE INFLUENCE.

A will otherwise valid will not be set aside on the ground of undue influence, unless it be shown that such undue influence operated on the mind of the testator, causing him to make a disposition which, except for such influence, he would not have made.

4. WILLS ⬲166(12)—CONTESTS—UNDUE INFLUENCE—EVIDENCE.

Undue influence vitiating a will may be proven by circumstantial evidence, and for that purpose evidence of the condition of the testator's mind, his weakness, the surrounding circumstances, and opportunity for the exercise of undue influence, the words and acts of the testator and beneficiary, and the existence of confidential relations between them, as well as the unnatural character of the will, is admissible.

5. WILLS ⬲164(6)—CONTESTS—EVIDENCE.

Where contestants asserted that a will was the result of undue influence, evidence that about two months after its execution the witness visited testatrix and suggested a trip to California, which proponent, the beneficiary of the will, successfully opposed, is admissible, for, where undue influence is in issue, the testatrix's declarations and course of conduct, expressive of mental state produced by such influence, whether contemporaneous with the execution of the will or within a reasonable time before or after its execution, are admissible on the question of the freedom of her will.

6. WILLS ⬲164(4)—EVIDENCE—ADMISSIBILITY.

Where a will was asserted to be the result of undue influence, evidence that, a few months after its execution, testatrix and proponent indulged in unnatural and illicit intercourse, is admissible to overcome the presumption of the validity of the will arising from testatrix's failure to revoke or destroy it before her death.

7. WILLS ⬲164(4) — CONTESTS — EVIDENCE—UNDUE INFLUENCE.

Evidence that testatrix, shortly after the execution of a will, gave proponent, a married man who had taken up his abode with her, a sum of money to send to his wife and children, is admissible on the issue of undue influence, tending to show that proponent still controlled testatrix.

8. WILLS ⬲164(7) — CONTESTS — EVIDENCE — UNDUE INFLUENCE.

Evidence that after her death morphine was found in the house of testatrix, taken in con-

nection with testimony of others that she frequently used morphine before the execution of the will, is admissible on the question of the condition of her mind at the time of execution, it being asserted that the will was the result of undue influence.

**9. WILLS ⊜⟹164(5) — CONTESTS — EVIDENCE — UNDUE INFLUENCE.**

Evidence that proponent, a married man who had taken up his residence with testatrix, controlled her, regulated her household affairs, etc., is admissible on the question of whether her will was the result of undue influence.

**10. APPEAL AND ERROR ⊜⟹501(4) — INSTRUCTIONS—EXCEPTIONS.**

An assignment complaining of the overruling of a requested charge cannot be considered, where there was nothing in the assignment or in the statement thereunder to show that the refusal of the charge was excepted to.

**11. WILLS ⊜⟹164(4)—CONTESTS—EVIDENCE—UNDUE INFLUENCE.**

Evidence that another man with whom she lived in adultery paid the expenses of testatrix and kept up her home, supplying her with money, is, where a will in favor of proponent, a second man who had taken up his residence with testatrix, was attacked as the result of undue influence, admissible as tending to show the unnatural disposition by testatrix of her property.

**12. EVIDENCE ⊜⟹553(1) — HYPOTHETICAL QUESTIONS—PROPRIETY.**

In a will contest case, where there was evidence that proponent, a married man had practically taken up his abode with testatrix, and ordered and controlled her household, coupled with evidence that the two had indulged in unnatural and meretricious intercourse, and that testatrix, who was supported by another man with whom she lived in adultery, was afflicted with disease and addicted to drugs, hypothetical questions, based on such facts, as to whether testatrix was afflicted with masochism, were proper.

**13. EVIDENCE ⊜⟹553(1) — HYPOTHETICAL QUESTIONS—PROPRIETY.**

Where there was testimony as to testatrix's habitual use of chloral, morphine, and asperin, hypothetical questions as to the effect of such drug habits on her mind were proper; the will being attacked on the ground of undue influence.

**14. EVIDENCE ⊜⟹510—EXPERT—MENTAL CONDITION—MASOCHISM.**

Medical testimony, based on evidence that the proponent completely dominated testatrix and satisfied her unnatural sexual desires, to the effect that testatrix was a masochist, and that being such she was subservient to proponent, was admissible on question whether a will in favor of proponent was the result of undue influence.

**15. TRIAL ⊜⟹133(6) — ARGUMENT — IMPROPRIETY.**

In a will contest case, counsel for the contestants in his argument stated that the jury should consider whether the estate should go to the proponent, who was a thoroughly disreputable character, or to his client, the mother of seven children, living with her husband in a lumber camp. On objection by proponent, counsel for the contestant stated that objection having been made, he withdrew the statement. On the following morning, the court, though it had previously overruled the objection to the argument, charged the jury that they should disregard such statement. *Held*, that the argument, though improper, was not prejudicial, and could not vitiate a judgment for contestant.

**16. APPEAL AND ERROR ⊜⟹432 — DOCKETING OF APPEAL—TIME—COUNTY COURT.**

Rev. St. 1911, art. 3635, declares that, when an appeal bond is filed in the county clerk's office, it shall be the duty of such clerk to immediately make out a certified transcript of the papers and proceedings relating to the decision, order, judgment, or decree appealed from, etc., and transmit them to the clerk of the district court, together with the appeal bond, on or before the first day of the next term of such court, while article 3636 provides that in case the county clerk shall be unable for want of time to make out such transcript before the first day of the next term of the district court after appeal has been taken, such transcript shall be presented to the next succeeding term of such district court. An appeal from the county court of the county of Harris was perfected on June 5, 1915, and the transcript was filed by the clerk of the district court on August 21st. Rev. St. 1911, art. 30, subd. 11, provides that in all suits, actions, or proceedings, it shall be sufficient in every instance for the address or designation to be merely "the district court of Harris county," and the county clerk shall docket alternately on the dockets of the Eleventh judicial district, the Fifty-Fifth judicial district, and the Sixty-First judicial district all cases filed. The Eightieth district court, which also sits in the county of Harris, was created by Acts 34th Leg. (1st Called Sess.) c. 19, which took effect on the 3d day of September, 1915. Under article 30, the next term of the Eleventh district court after the appeal was June 7, 1915, that of the Fifty-Fifth September 6th, and the Sixty-Fifth June 21st, followed by another term beginning August 16th. The appeal was finally transferred to the Eightieth district court. *Held* that, as the clerk of the county court was merely required to use diligence in preparing and sending the transcript of the papers to the first term of the district court after the appeal bond was filed, and it did not appear from the record in which of the district courts the transcript should have been, or was in fact, filed, the appeal will not be dismissed as having been filed too late, even though with respect to the Sixty-First district court it was not filed until after the second term.

**17. APPEAL AND ERROR ⊜⟹1001(1)—REVIEW—EVIDENCE.**

An appellate court, reviewing the sufficiency of the evidence to support a verdict, merely determines whether the evidence was sufficient to go to the jury.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Application by C. D. Beadle for the probate of the will of Mamie Reynolds, deceased, opposed by Kitty McCrabb, who appealed from an order of the probate court admitting the will to probate. Thereafter Mary Wilkens and another intervened as contestants. From a judgment denying the will probate, proponent appeals. Affirmed.

Lane, Wolters & Storey and Love, Channell & Fouts, all of Houston, for appellant. Baker, Botts, Parker & Garwood, John H. Crooker, John C. Townes, Jr., and Cooper & Merrill, all of Houston, for appellees.

LANE, J. This was a proceeding instituted by C. D. Beadle, appellant, in the probate court of Harris county, Tex., to probate the will of Mamie Reynolds, deceased. The application for probate in the county court was contested in that court by Kitty McCrabb, and upon a hearing in that court the will was admitted to probate. Contestant appealed from the order probating said

will to the district court. After the cause was transferred to the district court by appeal, appellees Mary Wilkens and her husband, by intervention, joined in the contest. Upon the trial in the district court judgment was rendered sustaining the contest, and refusing to probate the will. From such judgment C. D. Beadle appealed to this court.

The pleadings of the contestants, in substance, alleged: (1) That contestants were heirs at law of Mamie Reynolds, deceased, and interested in her estate as such. (2) That the will of Mamie Reynolds now offered for probate should not be admitted to probate, and that C. D. Beadle, the beneficiary under the proposed will, should not be permitted to receive and get the benefit of the property which belonged to the said Mamie Reynolds at the time of her death; in this connection as grounds of contest, assigns the following reasons why said will should not be admitted to probate, to wit: (a) That the said Mamie Reynolds, deceased, at the time of the alleged making of said pretended will and at the time of the making of the alleged codicil thereto, was not of sound mind and disposing memory. (b) Because said will and codicil were executed, if at all, under an undue influence exercised by the beneficiary in said will, the said C. D. Beadle, who is named therein as executor without bond, and to whom said will undertakes to bequeath the property of the said Mamie Reynolds, deceased; that by reason of the relations existing between the testatrix (the said Mamie Reynolds) and the said C. D. Beadle at the time of and prior to the making of said will, and by reason of the undue influence exercised by the said C. D. Beadle at said time over the said testatrix, and by reason of the weakened condition of the mind of the testatrix at said time, the said testatrix was induced by the said influence and at the solicitation of the said C. D. Beadle to disinherit these contestants, and Beadle's influence was such that his will and desires, and not those of deceased, are expressed in the alleged will.

After the cause had been appealed to the district court proponent filed the following motion:

"Now in this cause comes the proponent and shows to the court that this is an attempted appeal by the contestant from an order and judgment of the probate court admitting the will of Mamie Reynolds, deceased, to probate, and this court has no jurisdiction of said appeal because the transcript from said county court was not filed in the district court at the next term after the appeal from the probate court was perfected as is required by law, and because said transcript was not so filed to the second term of the district court to which notice of appeal was given. Wherefore this proponent prays that this suit and the attempted appeal of the probate court to this court be dismissed."

This motion was refused by the court and thereupon appellant, C. D. Beadle, named as independent executor in the will of Mamie

Reynolds, in replication to the contestants, pleaded by general demurrer, and by special exception to section (b) of appellee's contest, on the ground that the allegations of undue influence therein were but the conclusions of the pleader, and not the statement of any facts supporting such conclusions, and that the same were too vague, general, and indefinite to apprise the proponent of the nature or character of evidence to be offered in support thereof. He also denied the allegations of contestants relative to the unsound mind of Mamie Reynolds, and of the allegations of undue influence.

[1] As there is nothing in the record to show that either the general demurrer or special exception, above mentioned, were presented to the court for its ruling thereon, or that any order was entered with reference thereto or disposing of the same, it is to be presumed that they were waived, and we shall therefore make no further mention of them in this opinion.

The cause was tried before a jury to whom the court submitted the following charge:

"This case is submitted to you upon special issues, and your verdict will be in form of an answer to one or both of such issues, according as you find the facts to be, and in keeping with the instructions herein given you.

"(1) You are charged that you are exclusive judges of the facts proven, the credibility of the witnesses and the weight to be given to their testimony, the law you must receive from the court, as given you in this charge, and be guided thereby.

"(2) By the term 'undue influence,' as that term is used in these charges, is meant such improper dominion, constraint, or control of one person exercised over the mind of another as to be sufficient to subvert and overthrow such other person's volition, or, in other words, to destroy his free agency, so that the party so influenced has been thereby induced to do that which he would not have done had he been left to act freely and voluntarily, the influence must be such that the act so done represents the result of the exercise of such dominion, constraint, or control, rather than the will and expression of the party doing the act.

"(3) The burden of proof is on the contestants to show by a preponderance of the testimony the affirmative of each of the following issues or questions submitted to you. Guided by the foregoing instructions and definitions, you will answer the following questions:

"Special issue No. 1. Did or did not C. D. Beadle exercise 'undue influence,' as that term has been heretofore explained to you, over the mind of Mamie Reynolds as to the act of making the instrument herein offered for probate as the last will of Mamie Reynolds? (Answer this question 'Yes' or 'No.')

"In the event you should answer the foregoing question or issue in the negative, you need not answer the following question; but, in the event you should answer the foregoing question or issue in the affirmative, then you will proceed to answer the following question or issue:

"Special issue No. 2. Did such 'undue influence,' exercised by the said C. D. Beadle over the said Mamie Reynolds to induce her to execute the instrument herein offered for probate, subvert and overthrow the will of said Mamie Reynolds and destroy her free agency and cause her to execute the instrument herein offered for probate as her last will, when, but for such influence, she would not have done so?

"If this question is answered, the answer should be either 'Yes,' or 'No.'"

The verdict of the jury was as follows: "We, the jury, find answers to the foregoing special issues as follows:

"To special issue No. 1, we answer, Yes.

"To special issue No. 2, we answer, Yes."

Upon this verdict the court rendered judgment refusing the probate of the will.

Appellant's first and second assignments are grouped and, in substance, are that the court erred in submitting the case to the jury and in not sustaining appellant's motion for an instructed verdict in his favor, because there was neither pleadings nor evidence to justify a submission of issues sought to be raised by the contestants. We think the allegations made by the contestants, in the absence of special exceptions being presented to the court, were sufficient to present the issues sought to be presented thereby. We have also reached the conclusion, after a careful consideration of all the evidence, not without difficulty, however, that the evidence is sufficient to support the findings of the jury and the judgment rendered.

[2-4] The question raised by the assignments under discussion being as to whether there is any evidence to support the verdict of the jury and judgment of the court, we shall not at this point do more than state the effect of the evidence tending to support the same. There is evidence showing that one McNeeley and Mamie Reynolds, deceased, had lived together in adultery for 14 or 15 years, and continued to so live until Mamie Reynolds died in 1915; that McNeeley was not constantly at the home of Mamie, but that whenever he was in Houston he made her house his home; that he habitually visited Houston once in every two weeks and sometimes once a week; that McNeeley was very generous to Mamie, and had purchased for her a valuable home in Houston at which she lived at the time of her death; that Mamie had accumulated and owned at the time of her death property of the probable value of $20,000; that some four or five years before her death Mamie suffered a slight attack of paralysis, which affected her limbs and eyes, and that at times she was irrational and not responsible for her acts; that about five years prior to her death Mamie formed the acquaintance of proponent, C. D. Beadle, who was at that time a married man, having a wife and several children, who were surviving up to the death of Mamie; that after Beadle formed the acquaintance of Mamie he made his home at her house almost constantly, and lived with her in adultery; that he accompanied her frequently and habitually to theaters, picture shows, and other public places; that during the five years Beadle lived with Mamie he gave her servants their orders as to meals, and as to buying supplies for the home of Mamie; that he directed Mamie as to her actions and conduct; that his commands were obeyed by Mamie; that when questioned as to her obedience to Beadle, she replied, "I can't help it; he will quarrel with me and make life so miserable that I have just got to give in to his whims."

It is shown that on one occasion testatrix sent certain furniture of her own to an upholsterer to be re-covered; that she selected material she desired and that the work was done as ordered by her, and to her satisfaction; that when she went to get the furniture proponent, Beadle, was with her and he refused to accept the work done and demanded that testatrix refuse to accept same; that his demand was complied with, and testatrix agreed to have new covers put on in accordance with Beadle's order, at an expense of $65 for removal of those put on, and had it re-covered to suit Beadle at an additional cost of $75; that testatrix said she would not dare to take the furniture to her home; that there were many other incidents tending to show that proponent had absolute control and dominion over testatrix, and that she never refused his demands.

Mrs. Painter, who had lived with testatrix for six or eight years, among other things testified that McNeeley, who supported testatrix, had a nice hothouse built in her yard where she wished it; that although proponent, Beadle, had no interest in the hothouse or the premises on which it was built, he demanded that the hothouse be torn down and removed, and that his demand was complied with; that testatrix told McNeeley, the man who supported her, that her reason for such removal was because she had been advised by an expert that no flowers would bloom in the house where it had been placed; but that she told the witness that Beadle did not like it there and did not want it there; that he wanted it on the back veranda, and was going to have what he wanted; that she said she would have to do it to keep peace in the family. She also testified that testatrix frequently used morphine and chloral; that Beadle advised her to use them.

The witness Harris testified that prior to the date of the will proponent had frequently expressed his dislike for contestant Kitty McCrabb, a sister of testatrix, and that on account of proponent's dislike for Kitty McCrabb, and upon his insistence, testatrix refused to further associate with her sister with whom she had previously been on the best of terms. He testified further that Beadle directed testatrix how he wanted things fixed up about the place; what he wanted done about the canary birds; that everything that was to be done he bossed it and had his way; that testatrix did as he said do; that on one occasion he took testatrix and proponent out for a drive and that he heard testatrix say to proponent, "I willed everything to you; I gave Kitty the

papers, and I have wiped my hands of her;" that he never heard Beadle make any reply to testatrix.

Neta Sherwood, a servant of testatrix, testified that she heard proponent tell testatrix that he did not want her sister Kitty about the home of testatrix; that he just said he did not want Kitty there, and did not want testatrix to go with her; that after this talk testatrix did not go to see Kitty, or let her come to her home; that before that time the two sisters were very friendly and often visited each other; that Beadle would tell testatrix what to do about the place and his wishes were always complied with.

R. J. Hughes also testified of incidents tending to show that Beadle dominated testatrix in relation to her affairs.

Kitty McCrabb, a sister of testatrix, who would have inherited an interest in her estate, had she died intestate, testified as follows:

"As to the relations between me and my sister from the time she began living there down to within the last four or five years, well, we used to visit all the time, and were very friendly, but the last four or five years since Beadle was there, he didn't seem to want me around there. Previous to the time Mr. Beadle came there and I got acquainted with him, my sister and I were very friendly and very intimate. We used to keep our business papers together, and we were both single, and we thought what was hers was mine, you know, and she always said if anything should happen she wanted things to be fixed so that my boy and I would have it, and I had my papers with her, and if anything happened to me she could always get the rent, because my boy was young and could not handle the property as he should, and so we kept our papers and everything together, until Beadle came in between us and things were changed altogether. As to our relations with reference to shopping and visiting together, well, we used to go shopping together and I used to go there and stay four or five days at a time, and go out riding together and always were together. Those relations changed in the last four or five years. She didn't seem to be the same. I think it was between four or five years ago that I first got acquainted with Beadle. I met him at my sister's house. As to whether or not I was on friendly terms with him after that, I didn't know him very well at that time and after that, well, I never had anything to do with him because my sister told me he objected. I stopped visiting there on his account."

She also testified to the desire of testatrix to have Blanche McArthur to come to Houston to live with her, and proponent's successful objection to the plan, by saying he didn't want her there.

Blanche McArthur, among other things, testified that her acquaintance with Mamie Reynolds was very intimate, having visited her at her home, and the deceased having visited the witness at her home; that the last visit the witness made to the deceased was in February and March, 1914; that Mamie Reynolds was living there with Mr. McNeeley, who was paying all the expenses, and, as the witness understood, gave her the property she was living on. She knew McNeeley and got acquainted with him at Miss Reynolds' home; that she did not know C. D. Beadle, and did not meet him until some time in 1914. On that visit she arrived on the 14th of February, and left the 2d of April, making her visit continue a little more than a month; possibly six weeks; that during the time of her visit to Mamie Reynolds on that occasion Beadle was there when McNeeley was not there. McNeeley was there only twice during her visit. He was ill at that time, in Beaumont, and came "home" twice during the time. Testifying further she said:

"Mr. Beadle acted very much as though he owned the place; he followed her every step. I had no opportunity to converse with her except by going into the toilet on the ground floor. Mr. Beadle followed her about the house very closely; he followed her constantly; took absolute control of the house when Mr. McNeeley was not there. Mr. Beadle did not afford an opportunity for any one to talk to Mamie Reynolds. He stood right at the phone, listening, when any conversation was held over the telephone, and at those times Miss Reynolds instructed me to take the extension phone, so that he could not take the extension phone to hear the conversation. As to his following her about the house, he would do that constantly. I had opportunity to talk to Mamie Reynolds privately when Mr. McNeeley was in the house. Mr. Beadle left before Mr. McNeeley came out, and Miss Reynolds and I then talked. Mr. Beadle's habit with reference to following her and watching her while she was even taking a bath was: He went in the bathroom whenever she took a bath, and he stayed in the bathroom constantly when she occupied the bathroom. This visit I made here was after the death of Mamie Reynolds' mother. I came here at Miss Reynolds' suggestion. I was asked to come here to help Miss Reynolds. The plan of Mamie Reynolds returning to California with me was discussed further after I came to Houston. That plan was made known to Mr. Beadle and discussed in his presence. The plan was that Miss Reynolds should rent her property here and move to California, returning with me. * * * I have heard Mr. Beadle discuss this plan and express his attitude toward it. Mr. Beadle said at the dinner table one evening when Miss Reynolds mentioned going to California, he said, 'You will never live in California.' Mr. Beadle was angry whenever we conversed about her going to California, and would always object to it. I know that the relations which existed between Mamie Reynolds and Mr. Beadle were intimate; that is, that they were living together when McNeeley was gone. They occupied the same bedroom and same bed when Mr. McNeeley was not there. Mr. Beadle was in the house continually when Mr. McNeeley was not there, and they occupied the same bedroom and same bed, as I stated, every night. Mr. Beadle never left the house unless he left it with Miss Reynolds, day or night. The attitude or action of Mr. Beadle with reference to controlling household matters was that he always offered suggestions, and would seem to object to anything Miss Reynolds cared to do or would have done. He objected and wanted things done his own way, and did not seem to be pleased with any suggestions that Mr. McNeeley would make, that Miss Reynolds would mention. As a rule, Mamie Reynolds did follow Mr. Beadle's suggestion. Mr. Beadle did direct the actions of the servants. He wanted her to discharge one servant that was in her employ, and Miss Reynolds objected, but told me she would probably have to do it to keep Mr. Beadle quiet. He (Beadle) objected to her carrying on any personal conversation with any one, and for that reason Miss Reynolds told me that in case her sister, Mrs. McCrabb, would phone her, I should say it was some one to buy birds, and let her talk with her. I have been

automobile riding with Mamie Reynolds; that was on this visit I speak of, and Mr. Beadle would always be present. On those rides Mr. Beadle would direct where we would go, and plan the details of the trip. We had planned to go to Galveston one day, and Mr. Beadle objected, and we merely drove around the Heights and came home again. Mamie Reynolds, deceased, had given C. D. Beadle money in my presence. She gave him $50 to send home to his wife, for the children, at one time. I recall the amount. At another time she gave him other amounts that I did not know just the exact amount. Before the money—the $50—was given to Mr. Beadle in my presence by Mamie Reynolds, he asked for the money to send home for his children—to send for the support of them would be more proper. I have seen Mamie Reynolds and Mr. Beadle in bed, sleeping together, and I recall an instance where I have seen them in bed together in the daytime. One morning I went into the bedroom to answer the telephone, and I saw them in bed together. The position I discovered them in· at that time was rather a compromising position, and Miss Reynolds immediately jumped out of bed and followed me into the hall to explain conditions to me. As to what attitude I found them in at that time, why his relations with her was unnatural, I should put it. They were having intercourse in an unnatural way; he was gratifying her passion in an abnormal way. Mamie Reynolds' body with reference to Beadle's body was just the opposite. The part of Beadle's body that was in contact with the sexual organs of Miss Reynolds' body was his head. It was quite frequent when, in the presence of myself and Beadle, Mamie Reynolds would express the desire to do something, and Mr. Beadle would express the desire not to do it; there were quite a number of times. On those occasions Mamie Reynolds usually did as Mr. Beadle asked her to, saying that it kept him from getting angry at her. * * * Her idea for requesting me to leave ˮmy bedroom doors open at night in cold weather was, she had told me of threats that Mr· Beadle had made to her, and asked me to leave my door open, that I might hear in case she should call; that was it, I presume. He had made threats in my presence, and I presume for that reason I must leave my door open. * * *"

There was also evidence to show that when McNeeley was on his visits to testatrix, prior to and after the execution of the will by testatrix on December 11, 1913, Beadle would secrete himself about the house of testatrix until McNeeley had left, so as to prevent him from knowing that he (Beadle) was on the premises, and from discovering his relations with testatrix. It also shows that the servants were advised by Beadle and testatrix that knowledge of the relations between Beadle and testatrix was to be kept from McNeeley. The evidence also shows that for about three years before the execution of the will, testatrix and Beadle occupied at night the same room and the same bed, and continued so to do up to the death of testatrix, except when McNeeley was in Houston.

Dr. E. C. Murray, among other things, testified that he was a practicing physician; that he was Mamie Reynolds' physician from 1908 or 1909 until she died; that he thought she was suffering from chronic syphilis; that he treated her for such trouble and she improved in 60 days; that at the time he treated Mamie he would say from his observations and knowledge of her that

she was not of a normal mind; that his judgment was that Mamie Reynolds had suffered with syphilis, but he did not know for how many years before she employed him in 1908 or 1909; that syphilis was a disease that would, under certain conditions, result in an apoplectic stroke sooner or later; that if it went into the arteries it was almost impossible to get it out; that it was the general acceptance of alienists that paresis and paranoia is a condition due to syphilis; that paresis is a syphilitic degeneration of the brain, or a gradual softening of the brain tissues, and paranoia is a delusion of insanity; that paresis is a mental impairment, and paranoia is its outward sign, causing the patient to have illusions and hallucinations, and that both paresis and paranoia are forms of insanity, and supposed to be incurable, and that' a patient may be suffering with either of those forms of insanity, and yet at times appear absolutely normal.

He further testified that the use of morphine by a patient affects the brain or mental capacity of the brain of patient; that the continued use of morphine would impair mental capacity and a continued use of chloral was a bad habit, and impairs the brain, as does morphine. The witness further ·ther testified that masochism is a sexual disorder, an abnormal form of sexual bondage. The witness thought that was what it was, and was pretty positive; that sexual bondage consisted of a person who would do anything for another person of the opposite sex for sexual gratification, as a sort of form of repayment, and that it was a sexual mental disorder; that if a woman's passions are gratified in an abnormal way by a man who uses his mouth on her sexual organs, instead of the way nature intended, it would impair the mentality of the victim if kept up; that the condition of masochism is hard to describe, and that the party affected by it would do anything sexually or anything physically or morally for the party that gratifies them; that instead of being normal, it is abnormal. The party proceeding along this line, he said:

"Just like where love is, the affection is founded on right premises; in masochism it is founded on where the party who is a masochist likes to be abused by the other person—be abused to a certain extent, and be controlled, either physically or by their will. It is an abnormal condition sexually."

The witness was then asked the following hypothetical question, and made the following answer thereto:

"Q. Assuming that Mamie Reynolds was being supported by Sam McNeeley, living in a house given her by Sam McNeeley, having been kept by him for 10 years, or more; further assuming that C. D. Beadle became acquainted with her some five years before her death; that Beadle did not contribute to her support; that Beadle was a·younger man than McNeeley, and younger than Mamie Reynolds; that. after her acquaintance with Beadle she permitted him to live with her, and permitted him to follow her about the house and direct the affairs of the house; permitted him to. carry her pocketbook;'

permitted him to direct the preparations of the meals and what they should eat; permitted him to accompany her to the bathroom when she was taking a bath; permitted him to gratify her sexual desires in the abnormal way I have mentioned, allowed him to dictate her decisions, and followed his preference largely in her course of conduct; further assuming that she was a chronic syphilitic, and used morphine, and at the instance of Beadle began the use of chloral, which she continued, further assuming that she would give Beadle money, or did give Beadle money, to send to his children, knowing at the time he had a wife and children; assuming those facts, state whether or not in your opinion Mamie Reynolds was masochist. A. Yes; covering that description of a masochist, she was."

But in that connection the witness further said:

"Where masochism exists in the woman, the free agency of the masochist is not supplanted by the will and mentality of the woman in the case, but it makes itself subservient to the other, because they wish to please them; wish to place themselves under their dominion. Yes; there is a subjection of the natural freedom of the will of the masochist to the will of the man in the case, and the liberty to act of the masochist is subdued."

Drs. S. C. Red and J. Hector McKay testified upon hypothetical questions, in substance, the same as the question propounded to Dr. Murray, hereinbefore set out, practically corroborating the testimony of Dr. Murray as to the probable and reasonable effect of the matters and things disclosed by the evidence hereinbefore detailed would have on the mind of Mamie Reynolds. They based their opinion upon their observations and experience as physicians of long practice and from information obtained from reading medical books. The evidence also shows that the proponent Beadle was 36 years of age and that Mamie Reynolds was an afflicted woman of 46 years of age; that at the time of the death of Mamie Reynolds proponent had the will in question, by which practically the whole of the estate of testatrix was bequeathed to him, in his possession and that he placed the same in the hands of his attorney for probate on the day the testatrix died. It also shows that when the contest was tried Beadle was in Houston, accessible to the court, and that he did not testify in the cause.

It is true that a will otherwise valid will not be set aside on the grounds of undue influence, unless it be shown that such undue influence operated on the mind of the testatrix at the time the will was executed, and had the effect to cause a disposition ·to be made of the property of the testatrix by the will which would not have been made except for the exercise of such undue influence; but it is not necessary that such proof be made by direct evidence. Such proof may be established by circumstances, as in other cases. The existence of undue influence vitiating a will may be proved by circumstantial evidence, such as the condition of testatrix's mind, weakness, and infirmities, her surroundings and the circumstances attending the making of the will, the opportunity for the exercise of undue influence, the words and acts of testatrix and the beneficiary, the existence of confidential relations between them, and the unnatural character of the will. Holt v. Guerguin, 156 S. W. 581; Mayes v. Mayes, 159 S. W. 919; Scott v. Townsend, 106 Tex. 322, 166 S. W. 1138; Barry v. Graciette, 71 S. W. 309.

The important inquiry, in determining whether or not the execution of the will in question was procured by undue influence, is not whether proponent, Beadle, exercised a general oppressive influence over testatrix, by which he absolutely controlled her actions with reference to the general management of her affairs, before or after the execution of her will, but whether or not that influence was present and governed her at the time of the execution of her will. To vitiate the will it must be shown by facts and circumstances legally sufficient that testatrix was impelled by the pressure of some undue influence to make a different will from what she would have made if she had been left entirely alone, and free to act according to her own judgment and discretion, her free agency must have been destroyed by the influence brought to bear upon her, and it is not material how this was done, so long as she was unable to resist, either through weakness or fear or desire for peace and quiet. Evidence of influence exerted before and after the execution of the will is admissible only as tending to indicate its existence at the time of executing the same.

In determining whether undue influence was exerted at the time of the execution of the will by Mamie Reynolds, it is relevant to establish the opportunity for the exercise of such influence; the meretricious relations existing between testatrix and proponent, a beneficiary under the will; the weakness of the mind of testatrix; any act or acts of proponent which would have the effect of placing testatrix under his influence and control; that proponent had alienated the affections of testatrix from. her sister, Kitty; that proponent had in fact absolute control over testatrix's conduct, and with matters relating to her business and home affairs, before and after the execution of the will; that he was the principal beneficiary under the will; that he had possession of the will at the time of the death of testatrix, and placed it in the hands of his attorney for probate on the very day testatrix died; the· unnatural character of the bequest to proponent, in that no bequest was made therein· to her sister and near relatives, nor for McNeeley, who had given her a large portion of the property she owned and had supported her for a number of years; and to also· show that, although proponent was accessible, he did not testify in his own behalf in explanation of the frauds and wrongs charged to him by contestants. We think there was sufficient evidence tò warrant the jury

in finding that all the relevant matters above mentioned had been established, and, if established, were sufficient to support a finding that the execution of the will in question was procured by proponent by means of undue influence which testatrix was unable to resist at the time of its execution.

Looking to the evidence, which the jury had the right to accept as true, showing the unnatural relations existing between testatrix, an afflicted woman of 46 years of age, and the mistress of McNeeley, on the one side, and proponent, Beadle, a man of 36 years of age, a married man with a wife and children, on the other side; showing the beastly conduct of Beadle in his relations with testatrix, which expert physicians say tended to render the mind and will of testatrix subservient to the will of Beadle; showing that proponent did have testatrix in a state of fear of him before and after the execution of the will in question, to such an extent as to enable him to have general control over her personal conduct and of her ordinary affairs; showing that proponent was receiving money from testatrix without rendering any legitimate service therefor; showing that proponent used his controlling powers over testatrix to keep her in his presence and under his dominion; showing that he alienated testatrix from her sister, Kitty McCrabb, a legal heir of testatrix; showing that proponent, as the principal beneficiary under testatrix's will, would receive property of the probable value of $20,000 under the terms of the will, if permitted to probate it; showing that testatrix thought it necessary to advise proponent, or at least did advise him, that she had willed to him all of her property; showing that proponent had possession of the will; and showing that, although contestants had charged proponent with beastly conduct with and toward testatrix before the execution of her will, and that such conduct gave him such control over her that she was unduly influenced to execute the will offered for probate, proponent, though accessible to the court, kept silent at the trial of the contest and did not undertake by his testimony to refute such charges—we think the jury were warranted in finding that proponent was exercising undue influence over testatrix at the time of the execution of the will offered for probate, and that, had not such undue influence existed at such time, she would have made a different disposition of her property. We therefore overrule assignments 1 and 2.

By the third assignment it is insisted that the court erred in not granting appellant's motion for new trial because the verdict of the jury was not supported by the evidence. What has been said under assignments 1 and 2 is a full answer to this assignment. The assignment is overruled.

[5] By assignments 4, 5, 6, and 7 it is insisted that the court erred in permitting Mrs. Blanche McArthur to testify that in February, 1914, about two months after the execution of the will, she visited testatrix at her home in Houston; that at that time she discussed with testatrix a plan, agreed upon between them, by which it was arranged that testatrix should rent her home in Houston and move to California with witness, in the presence of proponent, Beadle, and in permitting the same witness to testify to the acts, conduct, and relations of testatrix and proponent at that time, one to the other, and as to the acts, conduct, and declarations of the parties at that time, because the same was wholly irrelevant and immaterial to any issue in the case and was injurious to appellant. Where undue influence, as distinguished from mental incapacity, is in issue and is independently proved, testatrix's declarations, acts, and course of conduct, expressive of a mental state produced by such influence, whether contemporaneous with the execution of the will or within a reasonable time before or after its execution, are admissible on the question of her free will in executing it. Scott v. Townsend, 106 Tex. 322, 166 S. W. 1138. The testimony complained of casts its shadow backward, and, when taken in connection with other circumstances in evidence, tends to show that Beadle had continuously indulged in the same unnatural and beastly acts testified to by the witness McArthur from the time he formed intimate relations with testatrix, that he had dominion over testatrix all during such relations, and that he was probably using this power of control to keep testatrix from moving to California, out of his reach and power. We think the jury would have been warranted in finding from the evidence as a whole that it was the purpose of Beadle to keep testatrix in his presence or accessible to him, so that he might control her in the future, to the end that she would not change her will, which he had unduly influenced her to make, and by the terms of which he was to receive $20,000 worth of property. We think the testimony was properly admitted, and therefore overrule assignments 4, 5, 6, and 7.

[6] The eighth assignment complains of the admission of the testimony of Blanche McArthur as to transactions occurring after the execution of the will, tending to show an unnatural act indulged in by testatrix and proponent. We think the testimony complained of was properly admitted. It showed a continuation, after the will was executed, of the close confidential and illicit relations existing between testatrix and proponent before such execution, and tended to overcome any presumption of validity of the will that might arise from the failure of testatrix to revoke or destroy the will before her death, and for the reason that, when considered in connection with other facts and circumstances in evidence, it was relevant and material to the issue of undue influence.

[7] We overrule the ninth assignment. It was admissible to show that testatrix gave proponent $50 to send to his wife and children after the will was executed, because such act tends to show the continuation, after the execution of the will, of the close relations which were shown to exist before the execution of the will, and because it tended to show that proponent continued to control testatrix, and to show that proponent's purpose in forming and continuing his relations with testatrix was for pecuniary gain, all of which facts, together with other circumstances in evidence, might be considered by the jury in determining whether or not the execution of the will was procured by undue influence.

[8] The tenth and eleventh assignments are overruled. It was admissible to show by the witnesses that they found morphine in the house of testatrix after her death, when taken in connection with the testimony of other witnesses that testatrix frequently used morphine before the execution of the will, and because it tended to explain the condition of testatrix's mind.

[9] Assignments 12, 13, and 14 in various forms complain of the admission of the testimony of Mrs. Painter and others as to the acts, declarations, and transactions of testatrix and proponent, Beadle, with reference to the habits and conduct of Beadle making suggestions and demands to and upon testatrix as to her personal habits and actions relative to her household affairs, and as to the fact that testatrix complied with such suggestions and demands. What we have already said in discussing other assignments sufficiently disposes of the contention here made. Such evidence was admissible on the issue of undue influence. The assignments are overruled.

[10, 11] By the fifteenth assignment complaint is made of the refusal of the court to give to the jury appellant's requested charge reading as follows:

"You are instructed that in arriving at your verdict in this case it would not be proper for you to consider, and you will not consider, any evidence which has been offered tending to show that Sam McNeeley paid the expenses of Mamie Reynolds, or paid the expenses of her household, or supplied her with money, or any testimony to the effect that, when the said McNeeley would come to the home of the said Mamie Reynolds, the said Beadle would leave, and that, when the said McNeeley would go away, Beadle would return to live or cohabit with the said Mamie Reynolds."

The evidence was properly admitted as tending to show the unnatural disposition of the properties of testatrix by the will; in other words, to show the character of the will. However, we overrule the assignment, because there is nothing in the assignment itself or in the statement thereunder, to show that the refusal of the court to give such charge was excepted to, as well as for the reason first stated.

[12, 13] By assignments 16, 17, 18, 19, 20, and 21 complaint is made in various forms of the action of the court in admitting the testimony of Drs. E. C. Murray and S. C. Red, upon hypothetical questions propounded to them by counsel for contestants with reference to the normal or abnormal condition of testatrix's mind, based upon the assumption of the truth of facts submitted to the witnesses by counsel for contestants. We overrule the assignments. We think there was sufficient testimony offered, prior to propounding the hypothetical questions, to warrant the questions. We have already detailed the facts proven, and will not undertake to restate the same under this assignment, as to do so would require the extension of this already lengthy opinion to an unreasonable length.

By assignment 22 complaint is made of the action of the court in permitting Dr. J. Hector McKay to testify with reference to the use of morphine and chloral by testatrix and the effect such use would have upon her mental condition, because there was no testimony showing the customary or habitual use of such drugs by testatrix, and therefore expert testimony as to the effect of the continued or customary use of such drugs was immaterial and inadmissible. Mrs. Painter testified that, when testatrix had headaches, she used chloral, asperin, and morphine; "that it was during Mamie's first illness that she acquired the use of morphine, and that afterward, when she was suffering from the illness testified about, she used morphine and chloral." The witness was then asked: "Did she or not habitually use those two medicines?" To which she answered: "Yes, sir; in pain." Witnesses Kessler and Kitty McCrabb testified that they found morphine in testatrix's house immediately after her death. We think this testimony was a sufficient predicate for the question and the admission of the testimony complained of. We overrule the assignment.

[14] By assignments 23 and 24 complaint is made of the action of the court in permitting Dr. McKay, in response to a hypothetical question propounded to him, to testify that testatrix was a masochist, and to further testify as to the effect of such a condition upon the mind of one given to its practice. The contention of appellant under the assignment is, first, that testimony tending to show that the relations of testatrix to Beadle, a beneficiary under her will, was such as to render her susceptible to his influence was inadmissible, unless it be also shown that such influence was exerted in procuring the execution of the will; second, that there was no evidence to warrant the hypothetical question propounded under which the evidence was obtained.

We overrule the assignments. Mrs. McArthur testified to such acts between testatrix and Beadle, which, if frequently practiced, would make testatrix a masochist. We think it may be assumed, for the basis

of the hypothetical question, that where it is shown that a man and woman have been living together in a state of adultery for four or five years, and been occupying the same room and same bed; that when the woman was bathing the man insisted on being in the bathroom with her, and was in fact present in such bathroom when the woman took her baths; that the man was seen satisfying the passions of the woman by applying his mouth to her sexual organ; that such unnatural beastly act last stated had frequently been performed during the relation of the parties. And we also think the answer to such question, when considered in connection with other circumstances in evidence, was admissible as tending to show the state of testatrix's mind, and on the issue of undue influence. In re Caspar's Estate, 172 Cal. 147, 155 Pac. 631.

By assignments 25 to 32, inclusive, complaint is made of section 2 of the court's charge, set out in the first part of this opinion, and of the refusal of the court to give to the jury special charges 1 and 3 requested by appellant. After a careful reading of the charge of the court as a whole, and the questions propounded, we have reached the conclusion that it was sufficient, and fairly submitted the issues presented by the pleadings and evidence, and that special charges 1 and 3, requested by appellant, were properly refused.

[15] By assignment 33 complaint is made of the argument of J. C. Townes, counsel for contestant Mrs. Wilkens, wherein he said:

"I want to say to you that the contestants are entitled to a verdict in this case, because my client, Mrs. Wilkens, who is the mother of seven children, living in a lumber camp with her husband, is more entitled to the property left by Mamie Reynolds, deceased, than is this man Beadle, who the evidence shows to be a thoroughly disreputable character."

The bill of exception reserved, under which appellant presents this assignment is qualified by the trial court as follows:

"The foregoing bill of exception is approved with the following qualification: The language of Mr. Townes used to the jury, and of which complaint is made, is not set out in the bill, but was as follows: 'Gentlemen, you should consider whether this estate should go to C. D. Beadle under the circumstances, who is a thoroughly disreputable character, or should go to my client, Mrs. B. J. Wilkens, who is the mother of seven children, living with her husband in a lumber camp.' At this point counsel for proponent objected, which was overruled, as stated in the bill, whereupon Mr. Townes said to the jury: 'Gentlemen, objection has been made to what I have just said, and I withdraw it, and ask you to disregard it.' That after Mr. Townes concluded his argument that afternoon the court adjourned until the next morning, when the court gave and read to the jury the following written instruction: 'Gentlemen of the jury: Mr. Townes stated to you in his argument, in effect, that you should consider whether this estate should go to the contestants, or words to that effect; you are instructed by the court to disregard the statement of Mr. Townes; you, as jurors, are not concerned with the effect of your verdict. It is your duty to answer the

special issues submitted to you without reference to the effect of your answers.'"

While the language attributed to counsel in argument, as set out in the qualification of the court, is objectionable and should not have been used, we do not think it was of that class of argument, the harmful effect of which could not be, and was not, removed by the instruction of the court to the jury. We would not feel justified or warranted in reversing the judgment of the trial court on account of the argument complained of.

[16] By assignment 34 it is insisted that the court erred in refusing to dismiss the appeal from the county to the district court in this case for want of jurisdiction, upon motion of proponent, for the reason that the transcript of the proceedings in the probate court was not filed in the district court by the contestants, who were the appellants, on or before the next term of the district court after the appeal was perfected, and no reason or excuse being presented for such delay. The record shows that the appeal was perfected on the 5th day of June, 1915; that the transcript from the county court was filed by the clerk of the district court on the 21st day of August, 1915. It also shows that the transcript so filed was made up and certified by the county clerk on the 20th day of August, 1915. The district court to which such appeal was taken (there being three district courts in Harris county) was not named in the notice given. The time for the convening of the district courts of Harris county for civil and probate business after the appeal was perfected and before the transcript was filed by the district clerk, as fixed by law, was as follows: The Eleventh, June 7, 1915; the Fifty-Fifth, September 6, 1915; the Sixty-First, June 21 and August 16, 1915. R. S. art. 30, subds. 11, 55, and 61. The Eightieth district court, to which this case was finally transferred, and in which it was tried, came into existence by virtue of an act of the first called session of the Thirty-Fourth Legislature, 1915, which took effect on the 3d day of September, 1915, and was therefore not in existence at the time the transcript was filed by the clerk of the district court of Harris county. Acts 1st Called Sess. 34th Leg. page 37. The act mentioned makes the clerk of the district courts of Harris county, as that office then existed, clerk of the Eightieth district court in Harris county, with same powers and duties conferred and imposed by article 30, subd. 11, Revised Statutes. By article 30, subd. 11, Revised Statutes of Texas, it is provided that:

"In all suits, action or proceedings, it shall be sufficient in every instance for the address or designation to be merely 'the district court of Harris county'; and the clerk of said court shall docket alternately on the dockets of the Eleventh judicial district, of the Fifty-Fifth judicial district, and the Sixty-First judicial district, all cases filed, and all cases shall in this manner be docketed in and divided between said courts; but any cases pending in said courts may, in

the discretion of the respective judges thereof, be transferred from one of said courts to the other, and so from time to time; in case of the disqualification of the judge of either of said courts in any case, such case, on his suggestion of disqualification, shall stand transferred to one or the other of said courts, and be docketed by the clerk accordingly. The clerk of the district court of Harris county shall perform the duties of the clerk of the district court of the Sixty-First judicial district in like manner as he fills the duties of the clerk of the Eleventh and Fifty-Fifth * * * districts."

It is thus made to appear that at the time the notice of appeal was given in the probate court, June 5, 1915, and at the time the transcript was made up and filed by the clerk of the county and district courts on August 20th and 21st, respectively, there were three district courts for the disposition of civil business in Harris county, each of which had concurrent jurisdiction; that there was but one clerk for all of said courts, whose duty it was to file all cases received by him, whether originally or by appeal, in one or the other of said district courts, in rotation. R. S. art. 30, subd. 11. Evidently the clerk had filed the transcript in one of the district courts in existence on August 21, 1915; and we shall assume, in the absence of any showing to the contrary, that the judge of that court, in the exercise of discretion given him by article 30, subd. 11, transferred the same to the Eightieth district court, which tried the cause.

We think it apparent from the wording of article 30, subd. 11, that it was not the duty or privilege of contestants to name the court to which the appeal should be carried. The provisions of article 3635, Revised Statutes of Texas, are that when an appeal bond, as in this case, is filed in the county clerk's office, it shall be the duty of such clerk to immediately make out a certified transcript of the papers and proceedings relating to the decision, order, judgment or decree appealed from, etc., and transmit the same to the clerk of the district court, together with the appeal bond on or before the first day of the next term of such court. And article 3636 provides that, in case the county clerk shall be unable for want of time to make out such transcript before the first day of the next term of the district court of the county after such appeal is taken, then such transcript shall be transmitted to the next succeeding term of such district court. It is apparent from the articles of the statute mentioned that the county clerk was only required to exercise diligence in preparing and sending the transcript of the papers to the first term of the district court after the appeal bond was filed. That he did not make up the transcript in time for the first term of the Eleventh district court, which convened on the 7th of June, 1915, or for the next term of the Sixty-First district court after such appeal bond was filed, cannot be said to be negligence as a matter of law. Such

failure might have been, so far as the record discloses, for want of time to make out such transcript. There is nothing in the record to show in which of the district courts the transcript should have been or was in fact filed. If it was filed in the Eleventh district court, it was filed before the first day of the second term of that court, after filing of the appeal bond; and, if so filed, so far as the record shows, it would have been properly and timely filed, so as to confer jurisdiction upon that court; or if it was filed in the district court for the Fifty-Fifth district, which convened September 6th, it was filed before the first term of that court, after the appeal bond was filed, and thereby jurisdiction was conferred upon that court to try the cause. In other words, the trial court had jurisdiction by appeal over the subject-matter and the parties in suits of the nature of the one at bar, and, in the absence of a showing to the contrary, we think it must be assumed that the court inquired into the matter of its jurisdiction when such jurisdiction was attacked by appellant, and that upon such inquiry it was disclosed that its jurisdiction had attached. We overrule the assignment,

[17] "An appellate tribunal, sitting to review asserted errors at law, always regrets the necessity which here confronts us of presenting and analyzing matters of evidence. It regrets the necessity, because the analysis of the evidence may be and frequently is misunderstood to be an expression of the court's views as to the weight of the evidence. We are here compelled to set forth contestant's evidence for the single and sole purpose of determining whether it has legal weight and substantiability in and of itself, and without regard to the conflicting evidence to support the issues tendered by contestant, and what has been said and what may be said is to be construed, therefore, solely from this point of view, and not at all as expressing the court's opinion touching the question whether with contestant or with respondent lies the preponderance upon a review of all the evidence in the case. We are not here concerned with the conflicting evidence introduced by proponent. We repeat, we are concerned simply with the determination of the question as to whether the direct evidence introduced by contestant, with the reasonable inference permissible to a jury to draw therefrom, would have sustained the verdict of the jury in favor of the contestant." If it does, the findings of the jury and the judgment of the court should be sustained.

We have reached the conclusion that the evidence as a whole was sufficient to support the findings of the jury and the judgment of the trial court. We also reach the conclusion that no such error was committed by the trial court in the trial of the case as should require at our hands a reversal of the judg-

ment of that court. The judgment of the trial court is affirmed.

Affirmed.

### On Motion for Rehearing.

In our original opinion, in stating facts shown by the evidence, we inaccurately stated, first, that the witness Mrs. Painter lived with testatrix, Mamie Reynolds, about eight years; and, second, that appellant, C. D. Beadle, made his home at the house of testatrix from the time he became acquainted with her until she died, a period of about five years. Appellant has filed his motion for a rehearing, and therein complains of such inaccurate statements. While we do not think the errors materially affect the questions decided, it is not only with promptness that we acknowledge our error, but it is with pleasure that we as promptly make a correction.

The testimony does not show that Mrs. Painter lived with testatrix for eight years, but it does show that Mrs. Painter testified that she had known testatrix for the eight years next preceding her death; that she got acquainted with her while waiting on and nursing her mother, who lived with her; that she was at her home off and on for eight years, whenever there was any sickness in the family; that at one time she stayed there three months and saw testatrix daily; that she assisted in waiting on the mother of testatrix frequently during her sickness, who died on the 7th day of November, 1913; that she waited on testatrix about three weeks after the death of her mother. She also testified that testatrix had spells of rheumatism and a stroke of paralysis. With reference to the spells of rheumatism she testified that testatrix had them off and on during eight years, during all of her acquaintance. (Appellant's brief, page 37.) She further testified that she knew proponent, Beadle; that she got acquainted with him in a restaurant about six years ago, when she and testatrix, Mamie Reynolds, went out together one evening and met him; that after that time she saw him frequently with testatrix on the streets, in the picture shows, and at theaters; that she, testatrix, and Beadle attended the places named together; that she has seen Beadle at the home of testatrix at night; that he and testatrix occupied the same room; that when he was there he gave the servants their orders as to meals and what they should consist of when he was there, and as to what they should buy.

Neither does this testimony show that Beadle absolutely made his home at the house of testatrix at all times he was in Houston after he formed her acquaintance, as stated in our original opinion; but it does show he got acquainted with her about five years prior to her death, that, while he claimed to have a room at the Brazos Hotel,

he was frequently with Mamie Reynolds at her home, day and night, until her mother died in November, 1913, and that just about the time of such death Beadle moved his trunk to Mamie's house, and practically made it his place of residence until her death in April, 1915, and from the time he moved there kept her in his presence practically. We see no reason to change our conclusions as expressed in the original opinion, except as to the findings on the testimony herein mentioned.

Having hereby corrected such errors, the motion for rehearing is refused.